MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2017 ME 69
Docket:      Ken-15-627
Argued:      June 10, 2016
Decided:     April 11, 2017
Corrected:   July 27, 2017

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, JABAR, HJELM, and HUMPHREY, JJ.
Majority:    SAUFLEY, C.J., and ALEXANDER, MEAD, HJELM, and HUMPHREY, JJ.
Dissent:     JABAR, J.

ELIZABETH T. JALBERT

v.

MAINE PUBLIC EMPLOYEES RETIREMENT SYSTEM

HJELM, J.

[¶1]   Elizabeth T. Jalbert appeals from a judgment entered in the Superior Court (Kennebec County, *Marden, J.*) affirming the decision of the Maine Public Employees Retirement System (MPERS) Board of Trustees (the Board) to adopt the hearing officer's recommended decision denying Jalbert's application for disability retirement benefits.  Because the record does not compel the conclusion that Jalbert has a mental or physical incapacity that "is expected to be permanent" and makes it "impossible to perform the duties of [her] employment position," 5 M.R.S. § 17921(1)(A)-(B) (2016), we affirm.

## I. BACKGROUND

[¶2] The following facts, which are supported by competent evidence in the record, are drawn from the recommended final decision issued by the hearing officer and adopted by the Board. *See Anderson v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 134, ¶ 5, 985 A.2d 501.

[¶3] Jalbert was employed as a teacher at Regional School Unit No. 1 for twenty-four years, beginning in 1989. In 2004, Jalbert applied to MPERS for disability retirement benefits, claiming that she suffered from bipolar disorder. Although Jalbert had received a positive employment evaluation that year, she alleged that her mental health condition adversely affected her ability to teach. In 2005, Jalbert withdrew her application for disability retirement benefits and continued teaching effectively despite her ongoing mental health conditions.

[¶4] In January 2012, Jalbert slipped on ice and fell twice, nine days apart, hitting her head each time. Jalbert was examined at an emergency room after each fall, and the physicians noted only minor head injuries. After the falls, however, Jalbert reported to several treatment providers that she was struggling with speech and concentration, and that her depression and anxiety had worsened. She was absent from work for most of the remaining

school year. In February 2012, Jalbert was examined by a neurologist who diagnosed her with post-concussion syndrome exacerbated by her pre-existing anxiety and depression, and he recommended that she see a speech therapist.

[¶5] Jalbert returned to work in September 2012 with modified duties. Around that same time, Jalbert underwent formal neuropsychological testing, which revealed strengths in intellectual ability, problem solving, short term memory, and language skills, but weaknesses in some aspects of attention and concentration. In November 2012, Jalbert's primary care physician provided her with a note excusing her from work based on her claim that she did not feel competent at her job. While on leave, Jalbert continued to see her primary care physician, neurologist, neuropsychologist, speech therapist, and mental health providers; and she received treatment for tinnitus, dizziness, and vision problems. Her official last date in service was April 10, 2013.

[¶6] In February 2013, Jalbert filed an application for disability retirement benefits with MPERS based on her diagnosed post-concussion syndrome, anxiety, and depression.[1] *See* 5 M.R.S. § 17925(1) (2013).[2] The

---

[1] Jalbert also alleged in her application that she suffered from diabetes, hypertension, and asthma. The Board ultimately denied benefits based on those conditions. Jalbert does not challenge that aspect of the Board's decision on appeal.

Executive Director's designee obtained extensive medical records from Jalbert's treatment providers. Those materials were then reviewed by a medical board comprised of eight physicians, *see id.*; 5 M.R.S. § 17106(3)(D) (2016), which issued two reports in June 2013 analyzing the effect of Jalbert's alleged health conditions on her ability to teach: the first report analyzed post-concussion syndrome, and the second report analyzed anxiety and depression. The Executive Director's designee ultimately denied Jalbert's application, *see* 5 M.R.S. §§ 17921(1), 17924(1) (2016), and Jalbert appealed to the Board, *see* 5 M.R.S. § 17451 (2016).

[¶7] A hearing was held before a hearing officer in February 2014 and the evidence was finally closed in April 2014. Because Jalbert chose to follow an "unrestricted appeal process," *see* 12 C.M.R. 94 411 702-2 § 6(2) (2014), the evidence presented to the hearing officer went beyond the voluminous medical records and June 2013 medical board reports already considered by the Executive Director's designee, and included testimony from Jalbert, her daughter, and one of her colleagues; transcribed testimony of Jalbert's neurologist; and additional medical records and responses to requests for information from six of Jalbert's treatment providers.

---

2 Title 5 M.R.S. § 17925(1) has since been amended, though the amendments are not relevant in the present case. *See* P.L. 2015, ch. 392, § 1 (effective July 29, 2016) (codified at 5 M.R.S. § 17925(1) (2016)).

[¶8]   After the close of all the evidence, the hearing officer returned Jalbert's appeal to the Executive Director for a reconsidered decision.  *See* 12 C.M.R. 94 411 702-2 § 6(2)(B).  The Executive Director consulted with the medical board, *see id.*, which issued two additional reports in May 2014 stating its opinion that the cumulative evidence failed to establish the existence of significant functional limitations related to post-concussion syndrome, anxiety, or depression.  A Deputy Executive Director then issued a reconsidered decision affirming the earlier decision of the Executive Director's designee to deny Jalbert's application for benefits and returned the matter to the hearing officer.  *See* 12 C.M.R. 94 411 702-5 § 15(1) (2014).

[¶9]   In the summer and fall of 2014, the parties filed post-hearing briefs with the hearing officer and commented on the hearing officer's draft decision.  After responding to the parties' comments, in October 2014, the hearing officer issued a recommended final decision, *see* 5 M.R.S. § 17106-A (2016), which was supported by extensive findings of fact and concluded that Jalbert had not satisfied her burden of proving that her conditions made it "impossible to perform the duties of [her] employment position," *id.* § 17921(1)(B).  The hearing officer's decision was based on the following key findings: medical records and other evidence contemporaneous with Jalbert's

head injuries indicated that when she fell, the impacts were mild; objective testing showed that Jalbert's mental functions were only minimally impaired; Jalbert's decline in functional capacity was inconsistent with her diagnosis of post-concussion syndrome and was not sufficiently explained by her doctors; and Jalbert's current alleged impairments closely resembled those alleged in her 2004 application for benefits.

[¶10]    The Board concluded that the hearing officer's decision was "supported by the record as a whole" and adopted it in full.  *See id.* § 17106-A(1).  Jalbert filed a complaint for review of the Board's decision in the Superior Court, *see* 5 M.R.S. §§ 11001-11007 (2016); M.R. Civ. P. 80C, which affirmed the Board's decision.  This appeal followed.

## II.  DISCUSSION

[¶11] Jalbert argues that the Board erred by concluding that she did not qualify for disability retirement benefits.  To qualify for the benefits, Jalbert was required to prove that she has a mental or physical incapacity that (1) "is expected to be permanent," and (2) makes it "impossible to perform the duties of [her] employment position."[3]    5 M.R.S. §§ 17921(1), 17924(1).    In

---

[3]  We are unpersuaded by Jalbert's argument that the Board erroneously failed to consider the combined effect of her physical and emotional conditions in determining whether she was disabled. The Board expressly acknowledged that Jalbert's application was based on "post-concussive syndrome *and comorbid anxiety and depression*," but ultimately denied her request for benefits.

7

particular, she contends that the evidence compelled the Board to grant her application for benefits and that the Board placed improper weight on the medical board's reports.

[¶12] When the Superior Court acts in its appellate capacity pursuant to M.R. Civ. P. 80C, we review the decision of the fact-finding agency directly. *See Rossignol v. Me. Pub. Emps. Ret. Sys.*, 2016 ME 115, ¶ 6, 144 A.3d 1175. "As the fact-finder, the Board has the authority to determine the weight to be given to the evidence, and we will not substitute our judgment for the Board's." *Id.* (citing 5 M.R.S. § 11007(3)). Additionally, because Jalbert had the burden of proof before the agency, "we will vacate the Board's determination that [s]he failed to meet that burden only if the record compels a contrary conclusion to the exclusion of any other inference." *Id.* (quotation marks omitted).

[¶13] Contrary to Jalbert's contention, the record does not compel the conclusion that she met her burden of proving that she qualifies for benefits pursuant to sections 17921(1) and 17924(1). As the Board concluded in its

---

(Emphasis added.) This characterization of Jalbert's argument demonstrates that the Board considered the combined effect of her conditions. *See Hale-Rice v. Me. State Ret. Sys.*, 1997 ME 64, ¶¶ 10-11, 691 A.2d 1232.

Additionally, Jalbert's arguments in support of her assertion that the proceedings were tainted by bias are insufficient to overcome the presumption that the agency fact-finders acted in good faith. *See Rossignol v. Me. Pub. Emps. Ret. Sys.*, 2016 ME 115, ¶ 4 n.3, 144 A.3d 1175.

final decision, the hearing officer's findings are supported by competent evidence in the record, including reports from Jalbert's emergency room visits in January 2012 describing her head injuries as "mild" and "minor," and stating that the second fall did not result in any loss of consciousness; a neuropsychologist's report from September 2012 stating that Jalbert was "performing quite well on a wide range of cognitive measures," although she had some difficulty with concentration; reports from Jalbert's neurologist stating that she was "doing better over time," that she had done "quite well overall" in a cognitive assessment but lost points for fluency, and that he expected that Jalbert would fully recover and return to work; and a "speech therapy discharge summary" issued in February 2013 stating that Jalbert had "met her goals," that her communication skills were "within functional limits with no evidence of word finding deficits or dysfluency," and that she was "in a position to do what is required by her daily life." Given this evidence, the Board was not compelled to determine that Jalbert met her burden of demonstrating eligibility for disability retirement benefits.

[¶14] Jalbert goes on to challenge the opinions reached by the medical board. In the portion of the hearing officer's decision that explicitly analyzed whether Jalbert had satisfied her burden of proving a disability, the hearing

officer cited to significant evidence from Jalbert's own physicians but made only a brief reference to the medical board's May 2014 report concerning post-concussion syndrome, which the hearing officer pointed out was partially corroborated by one of Jalbert's physicians.[4]  Title 5 M.R.S. § 17106(4) (2016) governs the use of "medical evidence" and provides that "[t]he retirement system shall consider . . . the medical board's analysis in making a disability retirement determination."  *Id.* § 17106(4)(A); *see also id.* § 17106(4)(B) (acknowledging that the medical board may provide "medical evidence" in disability retirement benefit proceedings).  Jalbert did not object to the hearing officer's consideration of the medical board's May 2014 opinions as evidence, although she had an opportunity to do so both in her post-hearing brief filed with the hearing officer in June 2014 and in her September 2014 comments on the hearing officer's draft decision.[5]  Therefore,

---

[4] In a separate section of the decision, the hearing officer comprehensively described the reports submitted by the medical board in June 2013 and May 2014.  Aside from the brief reference to the medical board's discussion about post-concussion syndrome noted in the text, however, the hearing officer did not adopt the medical board's opinions and assessments of the evidence as his own.

[5] Although the hearing officer did not reference the medical board's June 2013 reports in his discussion, we note that those reports were admitted in evidence without objection from either party.

Additionally, the hearing officer's draft decision specifically stated, "The Medical Board's memoranda *are properly considered to be evidence* that can call into question the validity of the Appellant's expert medical evidence on any particular issue."  (Emphasis added.)  In her comments on the decision *before* it became final, Jalbert did not challenge this statement despite having the opportunity to do so.

although Jalbert argues that the Board erred in not rejecting the *substance* of the medical board's opinion, to the extent that Jalbert's argument is that the Board erred in considering the reports at all, the hearing officer and the Board did not err by doing so—and in fact they were *required* to take the medical board's analysis into account when making the disability retirement determination.[6] *See id.* § 17106(4)(A); *see also Anderson*, 2009 ME 134, ¶¶ 26,

---

[6] Before 2009, section 17106 did not contain the current provisions governing the use of "medical evidence" in disability retirement proceedings, and the statute therefore did not require MPERS to consider the medical board's analysis when determining whether an applicant was disabled. *See* 5 M.R.S. § 17106 (2008). In a decision that applied that earlier formulation of the statute, we held that the medical board's memoranda do not rise to the level of "prefiled testimony" that triggers the applicant's statutory right to cross-examine the medical board's members. *See Kelley v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 27, ¶ 25, 967 A.2d 676 (discussing the statute governing "prefil[ed] testimony," 5 M.R.S. § 9057(4) (2008), which has remained the same since *Kelley* was decided). In a separate decision that also applied the earlier version of section 17106, *see Anderson v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 134, ¶ 28, 985 A.2d 501, we held that information in a medical board's report *is* part of the administrative record and may even be sufficient to defeat a disability retirement application. The Legislature subsequently amended section 17106 to add the provisions, noted in the text, that describe the medical board's analyses as "medical evidence" and require MPERS to consider those analyses when making disability retirement determinations. *See* P.L. 2009, ch. 322 § 6 (effective Sept. 12, 2009) (codified at 5 M.R.S. § 17106(4) (2016)). The amendment, however, also added language stating, "The medical board is advisory only to the retirement system." *Id.* That language is consistent with other statutory language that was in effect when we decided *Kelley* and *Anderson*, describing the medical board's duties in terms such as "recommend," "assist," "inform," and "advise." *Id.*

As we have noted above, *see supra* n.5, Jalbert did not challenge the inclusion of the medical board reports as evidence in the administrative record. Further, she did not attempt to call the medical board's members as witnesses or argue that she was entitled to cross-examine them. Additionally, she did not argue at the administrative level, and does not argue on appeal, that the reports—which are now statutorily treated as "medical evidence"—are "prefiled testimony" within the meaning of section 9057(4). Indeed, Jalbert affirmatively acknowledges in her brief that the Board *was* "allowed to consider" the medical board's reports when determining her eligibility for benefits, and challenges only the weight assigned to them. Because Jalbert has framed her argument in this way, we do not reach any question of whether medical board reports and memoranda are properly included in the record in the first place as evidence pursuant to section 17106(4) when an applicant is not given an opportunity to cross-examine the board's members. *Cf. Antler's Inn & Rest., LLC v. Dep't of Pub. Safety*, 2012 ME 143, ¶ 9, 60 A.3d 1248 ("[A]n argument,

11

28, 985 A.2d 501 (stating that the Board may consider reports of the medical board "as part of the record").

[¶15]  Beyond this, we are not persuaded by Jalbert's explicit challenge, which is to the weight that might be assigned to the medical board's reports. "[H]earing officers may accept, reject or determine the amount of weight to be given any information offered into evidence, including, but not limited to, medical evidence submitted by any of the parties to the appeal."  5 M.R.S. § 17106-A(3); *see also id.* § 17106(4)(B) ("Explicit or implicit preferential weight may not be afforded any medical evidence or source of evidence, whether provided by the retirement system, its medical board or contracted examiners, or by any member . . . .").  Here, the Board's decision to deny Jalbert's application for benefits was based on an assessment of the evidence that does not reflect legal error.

[¶16]  Although the record contains evidence that could support a finding that Jalbert is disabled within the meaning of section 17921(1), the record, when considered as a whole, does not compel that determination. Accordingly, the Board did not err by denying Jalbert's application for disability retirement benefits.

---

even one of constitutional dimension, that is not raised before an administrative agency may not be raised for the first time on appeal.").

The entry is:

Judgment affirmed.

---

JABAR, J., dissenting.

[¶17]   I respectfully dissent because I believe the record compels a contrary conclusion.  The evidence presented before the hearing officer does not support his decision in this case, and therefore I would vacate.

[¶18]   The hearing officer was required to determine whether the medical evidence supported Jalbert's application for disability retirement benefits.  *See* 5 M.R.S. § 17106-A (2016).  This undertaking is highly dependent upon the testimony of expert witnesses, and we have held that it is the province of the fact-finder, in this instance the hearing officer, to determine what weight is to be given to this testimony.  *See Handrahan v. Malenko*, 2011 ME 15, ¶ 14, 12 A.3d 79 ("A court is not required to believe the testimony of any particular witness, expert or otherwise, even when the witness's testimony is uncontradicted.") (citations omitted) (quotation marks omitted)).   However, "uncontradicted testimony is not to be utterly disregarded and arbitrarily ignored without reason."  *Thompson v. Johnson*, 270 A.2d 879, 881 (Me. 1970) (quotation marks omitted).  When reviewing

administrative actions, we defer to the agency's factual findings, but we do not act as a rubber stamp. *See Imagineering, Inc. v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991). To the contrary, we serve an appellate function, and when the evidence does not support the agency's decision we are obligated to vacate; otherwise we should simply eliminate appellate review of agency actions. *See id;* 5 M.R.S. §§ 11001, 11008 (2016); *Merrill v. Me. Pub. Emps. Ret. Sys.*, 2014 ME 100, ¶ 13, 98 A.3d 211.

[¶19] The record shows that the hearing officer "disregarded and arbitrarily ignored" overwhelming and uncontradicted medical expert testimony. The hearing officer, acting as a fact-finder, was free to disregard evidence presented by Jalbert. However, where numerous medical experts unanimously concurred that she is disabled and suffers functional limitations on account of that disability, and the System did not present any expert testimony to refute this evidence,[7] disregarding these opinions was arbitrary.

[¶20] Specifically, Jalbert presented the testimony of her primary care physician, a neurologist, an ophthalmologist, and several psychologists, all of whom opined that she was disabled and that the functional limitations

---

[7] The medical board has the authority to request that a claimant undergo a medical evaluation. *See* 5 M.R.S. § 17106(3)(B) (2016). The MPERS Executive Director also has the authority to request medical examinations. *See* 5 M.R.S. §§ 17921(1)(D), 17926 (2016). MPERS therefore had numerous opportunities to obtain and introduce independent expert testimony regarding Jalbert's medical condition.

associated with her disability made it impossible for her to work as an elementary school teacher.

## I. JALBERT'S EVIDENCE

[¶21] Jalbert was employed as a teacher at Dike-Newall Elementary School in Bath for twenty-four years. She received numerous positive evaluations and enjoyed an excellent reputation among staff and parents. In October 2004, she applied for disability retirement benefits for bipolar disorder, depression, and anxiety. In March 2005, she withdrew that application and continued teaching. After resuming her teaching duties, she treated with psychiatrist Lawrence Fischman, M.D., for her depression and anxiety.

[¶22] In late January and early February 2012, Jalbert sustained head injuries after suffering two falls within a short period of time. As a result of these injuries, she took medical leave, was out of work for the remainder of the 2011-12 school year, and received workers' compensation benefits for post-concussion syndrome. Upon her return to teaching that summer, she worked a modified, "light-duty" schedule aimed at accommodating her needs in light of her injuries. Her return was short-lived, however, after school officials determined at the beginning of the 2012-13 school year that this

modified arrangement was not feasible. On February 21, 2013, Jalbert again applied for disability retirement benefits. Because she had not yet attained the age of sixty, she could only receive retirement benefits by establishing the existence of a disability and functional limitations. *See* 5 M.R.S. § 17904 (2016).

[¶23] As part of her application for benefits, Jalbert submitted numerous records from her treating physicians, along with deposition testimony from Dr. John Taylor. Jalbert and a co-worker also testified before the hearing officer. The numerous medical records and deposition testimony contain five separate medical opinions unanimously agreeing that Jalbert has permanent functional limitations making her return to the classroom impossible.

[¶24] Carl Demars, M.D., was Jalbert's primary care physician and treated her for the injuries she sustained in the falls. He opined that Jalbert exhibited functional limitations and that she was unable "to return to her prior occupation as a teacher due to her concussion." Dr. Demars also referred her to Dr. Taylor for a neurological assessment.

[¶25] John Taylor, D.O., a neurologist, treated Jalbert for eighteen months, and opined that it was "impossible [for] her to perform [her] duties

as a school teacher." He reiterated this opinion in a letter dated January 24, 2014, and in his deposition testimony. He indicated that she had problems with cognition and "other features associated with post-concussive syndrome." He added that symptoms related to Jalbert's pre-existing diagnoses of premorbid anxiety and depression have "also been exacerbated and add to her overall functional disability."

[¶26] Philip Morse, Ph.D., a neuropsychologist, also examined and treated Jalbert. He saw her on four separate occasions and conducted numerous tests on her. He opined that it was "impossible for her to perform her duties as a school teacher," and that in his "neuropsychological opinion it is more likely than not that her incapacity is permanent."

[¶27] David Lilly, Psy.D., a psychologist, examined Jalbert upon a referral from Maureen Halmo, Ph.D., Jalbert's treating psychologist. Dr. Lilly treated Jalbert for her anxiety and problems adapting to her functional limitations and deficits outlined in Dr. Morse's neuropsychological evaluation. His findings were consistent with Dr. Morse's description of her impairment on attentional tasks. Dr. Lilly concurred with Dr. Morse and the other providers regarding the existence of her disability and the functional limitations associated with it.

[¶28]   Colin Robinson, O.D., an ophthalmologist, treated Jalbert for vision and balance issues that she experienced as a result of her head injuries. He opined that the two conditions he diagnosed her with—post-trauma vision syndrome and visual midline shift syndrome—made it impossible for her to perform her duties as a school teacher, and that it is more likely than not that her disability is permanent.

[¶29]   All of the professionals listed above concluded that Jalbert was not able to return to the classroom.  These opinions were based on Jalbert's subjective complaints, her physical examinations, and objective tests performed by her doctors over the course of her treatment.  These opinions also reveal that her cognitive, speech, vision, and psychological problems were interrelated and contributed to her disability.  The only evidence produced to refute these opinions were reports submitted by the medical board, which contained a number of conclusions that were not supported by the evidence.

## II.  MEDICAL BOARD REPORTS

[¶30]  The medical board reports relied upon by the hearing officer here consist of a report dated June 20, 2013, and one dated May 22, 2014.  The 2013 report was part of Joint Exhibit 1 and was entered in evidence without objection.  The 2014 report, however, was produced after the hearing and was

never offered in evidence but was provided to the hearing officer. Notwithstanding this anomaly, which allowed the hearing officer to consider the 2014 report even though it was produced *after* the close of evidence, for the purposes of this dissent, I agree with the Court that the 2014 report may also be considered as evidence on appeal.[8]

[¶31]  The 2013 and 2014 medical board reports consist of fewer than ten pages altogether.  The reports cherry-pick and selectively scrutinize individual medical record entries while making conclusions unsupported by the evidence.  For instance, the 2013 report acknowledged the existence of Jalbert's post-concussive syndrome diagnosis, but took issue with the purported absence from the record of an explanation as to why her condition

---

[8]  Citing *Kelley v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 27, 967 A.2d 676, and *Anderson v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 134, 985 A.2d 501, the hearing officer concluded that he could consider the medical board reports as evidence.  Neither *Kelley* nor *Anderson* held that these reports were evidence; rather, they narrowly decided that under the statute then in effect, the hearing officer could consider the reports, as advised, without the right of the applicant to cross-examine their authors.  *Anderson*, 2009 ME 134, ¶ 26, 985 A.2d 501; *Kelley*, 2009 ME 27, ¶ 25, 967 A.2d 676.

I believe that the plain language of 5 M.R.S. § 17106(4) (2016) as amended, which became effective after we decided *Anderson* and *Kelley*, specifically provides that the medical board's reports are evidence.  The Legislature amended this section by adding a provision that designates the medical board's analysis as "evidence."  *See* P.L. 2009, ch. 322 § 6 (effective Sept. 12, 2009) (codified at 5 M.R.S. § 17106(4) (2016)).  Following the amendment's clear designation of the medical board reports as evidence, these reports may now be subject to cross-examination to comply with the mandates of the Maine Administrative Procedures Act.  *See* 5 M.R.S. § 9057(3), (5) (2016).  Because our holdings in *Anderson* and *Kelley* did not interpret the current, amended statute, we should clarify at this time that, because the amended statute provides that the reports are to be considered evidence, the reports may be subject to cross-examination as required by the Maine Administrative Procedures Act.  *See id.*  In this case, Jalbert did not request the opportunity to cross-exam any members of the medical board.

had not improved. This line of inquiry is flawed. The proper focus should be on whether she was suffering from a disability causing functional limitations, and not whether there existed some explanation as to why her condition had not yet improved. *See* 5 M.R.S. § 17901 (2016).

[¶32] Similarly, the 2013 report acknowledged that Jalbert suffered from anxiety and depression. The board noted, however, that "[t]he records document that there are no functional limitations from anxiety and depression that would impair work function as of April 10, 2013." Again, without any explanation, the report concluded that, notwithstanding the opinions offered by Jalbert's medical providers—including that of Dr. Taylor which noted that her pre-existing anxiety and depression "exacerbated and add to her overall functional disability"—she didn't have any functional limitations stemming from these diagnoses. Also without explanation, the report indicated that "[t]here is evidence in the records to suggest that psychiatric issues and secondary gain could be significant contributing factors to the member's ultimate work separation."

[¶33] The hearing officer's reliance on the medical board's conclusions regarding Jalbert's motive for secondary gain was undoubtedly prejudicial. The Court states that the hearing officer "did not reference the medical

board's June 2013 reports." Court's Opinion ¶ 14 n.4. I disagree. There is a direct connection between the board's findings regarding secondary gain and the hearing officer's decision. The hearing officer referenced and relied on these prejudicial conclusions, noting in his decision:

> In light of this information, the Medical Board's conclusion was that the records did not show clearly that [Jalbert] had any persistent disabling symptoms that could be directly ascribed to the post-concussive syndrome. On this basis, the Medical Board did not find functional limitations based on post-concussive syndrome. *The Medical Board stated further that it found evidence in the records suggesting that psychiatric issues and secondary gain could have contributed significantly to [Jalbert's] ultimate work separation.*

(Emphasis added).

[¶34] The medical board's assertion regarding Jalbert's alleged motive for secondary gain was not supported by any medical evidence in the record. To the contrary, the only medical evidence in the record that addressed these issues was presented by Jalbert. Dr. Morse, Jalbert's treating psychologist, noted that after conducting neuropsychological testing, Jalbert "performed well, indicating no evidence of suboptimal effort, symptom magnification or potential malingering." Dr. Lilly agreed with Dr. Morse's assessment in this regard, noting that he had no concerns with Jalbert's efforts during testing and treatment. Even the hearing officer found in his decision that the

"neuropsychological testing of [Jalbert] found no evidence of suboptimal effort or malingering." Because there was no evidence of secondary gain on the record, the hearing officer's reference to secondary gain in his decision, which was based on the medical board's reports, was unsupported by the evidence.

[¶35] A claim of secondary gain has a profound impact on any fact-finder and necessarily affects the fact-finder's determination of credibility on any issue. *See* Deirdre M. Smith, *Who Says You're Disabled? The Role of Medical Evidence in the ADA Definition of Disability*, 82 Tul. L. Rev. 1, 45 (2007) ("Thus, it appears that the 'malingerer problem'—that is, the prospect of the existence of some individuals who may falsely claim to be disabled for secondary gain—has long colored the entire category of 'the disabled' as a group of individuals with automatically suspect credibility.").

[¶36] The hearing officer also improperly relied on the 2014 reports when he adopted the board's opinions that discredited the testimony of Jalbert and a co-worker, even though the medical board did not hear the testimony of these witnesses. In the 2014 report, the medical board wrote that, despite Jalbert's subjective complaints and corroborating history from a close friend, the board did "not believe that this represents unbiased,

objective information regarding her difficulties." Referencing this statement from the medical board report, the hearing officer stated in his decision:

> In its evaluation of the evidence, the Medical Board specifically critiqued the adequacy of the foundation for the opinions of Dr. Morse and Dr. DeMars in the complaints of [Jalbert] rendered to them by her and her friend . . . and rejected those opinions on the basis of subjectivity and bias.

[¶37] The board's conclusions discrediting Jalbert's witnesses is an improper credibility determination made by a body that neither observed nor heard this testimony. Again, there is a direct connection between the medical board's reports and the hearing officer's findings, and again the board's assertions were not supported by the evidence.

[¶38] Another assertion contained in the 2014 medical board report completely discredits the opinion of Dr. Robinson, an ophthalmologist. After evaluating Jalbert, Dr. Robinson made two diagnoses—post-trauma vision syndrome and visual midline shift syndrome—and opined that these diagnoses "would make it impossible [for] her to perform her duties as a school teacher." In its 2014 report, the medical board critiqued Dr. Robinson's diagnoses, opining that

it is the understanding of the Medical Board that these purported conditions are neither scientifically validated nor generally accepted as definable medical diagnoses by the ophthalmologic community at large.

[¶39] There is absolutely no evidence in the record to support this conclusion. Furthermore, there is no ophthalmologist on the medical board. Although the hearing officer discussed Dr. Robinson's diagnoses and opinions in his decision, he did not address Dr. Robinson's opinion that these diagnoses and the functional limitations resulting therefrom, *standing alone*, make it impossible for her to continue teaching. The Court's opinion also does not address this issue, or explain how Dr. Robinson's unrefuted opinion does not support Jalbert's claims for disability retirement benefits.

## III. CONCLUSION

[¶40] In conclusion, it is fundamentally unfair for an applicant for disability retirement benefits to have her medical evidence refuted by the unsupported assertions and conclusions contained in medical board reports.

[¶41] In this case, as a part of an adjudicatory hearing held pursuant to the Maine Administrative Procedures Act, the System did not present any medical expert witness opinions to refute the numerous medical opinions presented by Jalbert. Selectively scrutinizing and cherry-picking individual entries in voluminous medical records and making unsupported conclusions

should not overcome the unrefuted medical opinions of five experts who treated Jalbert for years. Despite a clear unanimity among Jalbert's treating physicians, who all opined that she was unable to return to a classroom of young children and fulfill her duties as a teacher, the hearing officer relied on a few pages of reports submitted by a medical board that neither examined nor treated Jalbert.

[¶42] Thus, I believe that the evidence presented here compels a contrary conclusion to that reached by the hearing officer, and therefore I would vacate.

___

Gerard P. Conley, Jr., Esq. (orally), Cloutier, Conley & Duffett, P.A., Portland, for appellant Elizabeth T. Jalbert

Janet T. Mills, Attorney General, Christopher L. Mann, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Maine Public Employees Retirement System

Kennebec County Superior Court docket number AP-2015-14
FOR CLERK REFERENCE ONLY